F I L E D
05/11/2021
*Shirley Faust*
CLERK
Missoula County District Court
STATE OF MONTANA
By: <u>Molly Reynolds</u>
DV-32-2021-0000572-OC
Larson, John W
1.00

Robert Farris-Olsen
Scott Peterson
Morrison, Sherwood, Wilson & Deola
P.O. Box 557
Helena, MT  59624
(406) 442-3261 Phone
(406) 443-7294 Fax
rfolsen@mswdlaw.com
speterson@mswdlaw.com

*Attorneys for Plaintiff*

# MONTANA FOURTH JUDICIAL DISTRICT COURT
# MISSOULA COUNTY

| | |
|---|---|
| JEE IRENE ESTAVILLA, individually, and on behalf of all similarly situated individuals.<br><br>Plaintiffs,<br><br>v.<br><br>THE GOODMAN GROUP, LLC; COMMUNITY NURSING, INC., d/b/a THE VILLAGE HEALTH & REHABILITATION f/k/a THE VILLAGE HEALTH CARE CENTER; and JOHN DOES 1-10,<br><br>Defendants. | Cause No: _____<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Comes now, JEE IRENE ESTAVILLA, individually and on behalf of all similarly situated individuals, and for her complaint against THE GOODMAN GROUP, LLC; and COMMUNITY NURSING, INC., d/b/a THE VILLAGE

HEALTH & REHABILITATION f/k/a THE VILLAGE HEALTH CARE CENTER (collectively "Defendants"), states and alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Jee Irene Estavilla is a Registered Nurse licensed to practice in the State of Montana and a former employee of the defendants. She is a citizen of the Republic of the Philippines and resides in Missoula, Montana.

2. The Goodman Group, Inc., is a foreign corporation registered in Minnesota, Montana. It manages 32 senior communities across the United States, including four nursing homes in Montana and eight nursing homes in other states. Its registered agent is located in Missoula, Montana.

3. Defendant Community Nursing, Inc., d/b/a The Village Health and Rehabilitation f/k/a The Village Health Care Center is a subsidiary of the Goodman Group, and is a nursing home located in Missoula, Montana.

4. John Does 1-10 are the other entities or individuals involved in the facts outlined below. They include at least two other nursing home facilities in Montana.

5. Venue and Jurisdiction are appropriate in this Court

## FACTS SPECIFIC TO NAMED PLAINTIFF

6. On or about August 19, 2015, Community Nursing sent an offer of conditional employment to Ms. Estavilla, who at the time was residing in Cebut City, Philippines.

7. The offer of employment advised that she would be offered employment as a Registered Nurse in Missoula, Montana, and be paid $25.52 per hour.

8. As part of the agreement, Community Nursing had to sponsor Ms. Estavilla as an employment-based immigrant. And, in order to be eligible for employment, Community Nursing advised Ms. Estavilla that she would have to meet certain credentialing requirements.

9. Ms. Estavilla was also required to maintain direct patient care responsibilities full time for six months before the final processing of her visa application. This was a requirement of Community Nursing.

10. In order to entice Ms. Estavilla to come to the U.S. and work, Community Nursing offered pay for:

   a. Costs of for Ms. Estavilla to meet the qualifications necessary to immigrate;
   b. A $1,000 incentive payment; and,
   c. For the first three months of employment, meals, lodging and utilities.

11. These amounts, though, were not gifts, but rather "advances" under the contract and were subject to repayment, and some of which were taxed as gross income.

12. Per the conditional offer, Ms. Estavilla would be responsible for repaying Community Nursing if she did not remain employed by the facility for at least three years. If, however, she worked for less than three years, but more than two, 50% of

the alleged amount owing would be forgiven. Any amounts forgiven were also taxable.

13. If Ms. Estavilla were terminated or otherwise left her employment, any unpaid amounts would be subject to an interest rate of 8% per annum as well as attorney fees and costs for collecting the money.

14. The conditional offer further threatened that if Ms. Estavilla failed to repay the amount, or otherwise breached the agreement she be reported to the U.S. Department of Labor, Immigration and Naturalization Service and/or Immigration and Customs Enforcement Agency.

15. The offer also contained a non-compete clause that covered the entire state of Montana and last for twelve months after termination of employment.

16. She would also be considered an at-will employee.

17. Ms. Estavilla signed the conditional offer of employment on August 21, 2015, and on or about July 3, 2017, Community Nursing reaffirmed the offer.

18. Ms. Estavilla moved to Montana and began working for Community Nursing on or about November 6, 2017.

19. At the same time, Community Nursing forced Ms. Estavilla to sign a promissory note in the amount of $26,642.47, which contained similar provisions as the conditional offer of employment – that if Ms. Estavilla did not maintain

employment with Community Nursing for at least three years, she would be responsible for repaying the $26,642.47.

20. Ms. Estavilla signed the promissory note about three months after moving to Missoula, but at the request of Community Nursing, she back-dated it to November 6, 2017. And, this was the first time she learned that the funds were considered an "advance" and not a gift or other consideration for her to uproot her life in the Philippines and move to Montana.

21. Ms. Estavilla worked for Community Nursing until May 24, 2019, when she was fired by Community Nursing.

22. On that date her employment was terminated because she was sick. Community Nursing sought to reassign Ms. Estavilla to a ward with older patients, and being sick, Ms. Estavilla did not want to endanger her patients so she took a day off.

23. During the termination meeting, Estavilla asked specifically which policies she violated, and was given none, and that there was no write-ups or written justifications for her termination because Community Nursing has a policy of not putting *anything* in writing.

24. Thereafter, Community Nursing made a demand that Ms. Estavilla repay the alleged advance. When Ms. Estavilla was unable to come up with nearly $27,000 Community Nursing sued her in Minnesota.

25.     The Goodman Group also issued Ms. Estavilla a cease and desist letter after she obtained subsequent employment.

26.     In all, Ms. Estavilla worked more than 18 months of a 36 month contract, yet Community Nursing sought to recoup the entire amount of costs, not a pro-rata share.

27.     After terminating, and suing Ms. Estavilla, the Goodman Group visited one of its facilities in Missoula, Montana and spoke with the nurses from the Philippines to address any concerns regarding their contracts. None of the nurses spoke openly about their concerns – they were afraid of being terminated like Ms. Estavilla. Put simply, the threat of termination and then legal action scared the nurses into submission.

## FACTS COMMON TO ALL CLAIMS

28.     In about 1998, the Goodman Group, Inc. filed its original certificate of organization in Minnesota. Since then created its Foreign Nurse Sponsorship Program (FNSP) to obtain the labor and services of foreign nurses to work in the United States. Relevant here, the Goodman Group specifically recruits nurses, such as Ms. Estavilla and Mr. Cabaltera, to work for nursing homes owned and operated by the Defendants in Montana.

29. On information and belief, the Goodman Group operates through its subsidiaries, like Community Nursing, Inc., to ostensibly hire and bring the nurses to the United States to work for a term period of 36 months.

30. On the front-end Defendants present a conditional offer of employment outline the proposed terms of the employment contract. The nurses have no option but to either accept or reject the proposed contract. Nurses generally accept because it offers an opportunity to earn the prevailing wage in the United States.

31. Approximately two years after the nurses sign the conditional employment offer, Defendants "reaffirm" the agreement, this is often after the nurse has arrived in the United States. In other words, the nurses have no real option to return home or reject the reaffirmation of the conditional employment offer.

32. When the nurse begins working for the Defendants, the nurse is considered an at-will employee. Meaning, the defendants can essentially terminate the nurse for any reason at any time.

33. Each of the conditional offers of employment contracts contains a penalty provision that requires the nurse to repay any amounts paid by defendants to bring the nurse to the United States if the employment ends in less than 36 months.

34. The nurses can avoid the penalty provision if they work for more the full 36 months, or 50% of the penalty will be forgiven if they work for 24 or more months. In all, this penalty provision is not tied to the losses of defendants.

35.	Each conditional offer of employment also contains a provision that if the nurse is terminated, for any cause or fails to pay the penalty, the defendants will report the nurse to the Department of Labor, Immigration and Naturalization Service and/or Immigration and Customs Enforcement Agency. Defendants make this threat regardless of the immigration status of the nurse.

36.	This reporting clause also defines the penalty as restitution, which it is not. Restitution is a term of art for a criminal penalty, not liquidated damages as identified in the contract.

37.	In addition to the reaffirmation of the conditional offer of employment, the nurses are required to sign a promissory note for the amount purportedly paid by the Defendants. Pursuant to the promissory note, if the nurses employment is terminated prior to the end of the contract term, then the defendants may deduct the balance allegedly due from any compensation owed, including a final payroll check, to the nurse.

38.	Defendants have utilized this system to recruit nurses from the Philippines, bring them to the United States to work as nurses, then before the term contract is up, find a reason to terminate the employee's contract, and then threaten to or pursue a lawsuit to recover any amounts expended.

39.	 And after the nurse is terminated, the contract contains a non-compete clause that prohibits the nurse form working in his or her chosen field in Montana.

40. At the same time, Defendants pursue legal actions against the nurses outside of Montana requiring them to find legal counsel in Minnesota.

41. Then, when the Defendants obtain a judgment, or default judgment, the Defendants recover their costs and attorney fees from the nurse, after having exploited the nurse's skill set.

## CLASS ACTION CLAIMS

42. Defendants' conduct outlined above, applied to all foreign nurses they recruited and employed in this Judicial District.

43. Plaintiffs therefore bring the claims as a class action pursuant to Rule 23(b)(2) and 23(b)(3) of the Montana Rules of Civil Procedures.

44. The class is comprised of all nurses who were recruited by the Defendants outside the United States and commenced employment with the defendants in the State of Montana within 10 years preceding the filing of this Complaint.

45. The Claims of the class are properly brought as a class action pursuant to Rule 23(b)(2) of the Montana Rules of Civil Procedure because the defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

46. The claims of the class are properly brought as a class action pursuant to Rule 23(b)(3) of the Montana Rules of Civil Procedure for the following reasons:

a. Numerosity: The potential numbers of the class are so numerous that joinder of all members of the class is impracticable. The Goodman Group manages thirty-two senior living communities in the United States, including four nursing homes in Montana. The joinder of all foreign nurses would make joinder impracticable.

b. Commonality: Common questions of law and fact common to plaintiff and the class that predominate over any other questions affecting only individual members of the class. These common questions include, without limitation:

    i. Whether defendants engaged in a practice of recruiting and then terminating nurses prior to the termination of their contract in an attempt to recoup any costs they advanced, and using a non-compete clause to prohibit nurses from obtaining new work.

    ii. Whether defendants engaged in a policy and practice of using abusive legal action and threats of such legal action to coerce foreign nurses to continue working for them.

    iii. Whether defendants engaged in a policy and practice of using their liquidated damages clause to coerce foreign nurses to continue working for them.

    iv. Whether defendants are liable to the class;

    v. Whether the class can be made whole by the payment of damages.

c. Typicality: Plaintiffs' claims are typical of the claims of the class, each member of the class was hired and recruited using the same methods.

d. Adequacy of Representation: Plaintiff will fairly and adequately represent the interest of the class members. Plaintiffs' counsel is competent, and his firm is skilled in prosecuting class actions.

e. Superiority: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Each class member has been damaged and is entitled to recover because of defendants' illegal policies and practices. Individual joinder of all class members is not practicable, and questions of law and fact common to the class predominate over any questions affecting only individual members of the class. Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

## COUNT I – 18 U.S.C. § 1595

47. The preceding paragraphs are realleged as though stated in full herein.

48. Defendants knowingly provided and obtained the labor and services of plaintiffs and other class members by abuse or threatened abuse of law or legal process including, without limitation, the threatened use of law or legal process in order to exert pressure on plaintiffs and other class members to continue working for the Defendant and to refrain from seeking employment elsewhere.

49. Defendants knowingly provided and obtained the labor and services of the class by means of serious harm and threats of serious harm to plaintiffs and class members including, but not limited to, psychological, financial, or reputational harm that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

50. Defendants knowingly provided and obtained labor or plaintiffs and class members by means of a scheme, pattern, or plan intended to cause plaintiffs and other members of the class to believe that if they did not perform such labor or services, they would suffer serious harm, including, but not limited to, psychological, financial, or reputational harm that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

51. Defendants knowingly benefitted, financially or by receiving other value, from participation in a venture which has engaged in the providing or obtaining of labor or services by the means described above, knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by such means.

52. Defendants knowingly recruited, transported, provided and obtained plaintiff and members of the class for labor or services in violation of 18 U.S.C. §§ 1589, 1590, 1594(a) and 1594(b).

53. By reason of the conduct described above, defendants were perpetrators of violations of 18 U.S.C. §§ 1589, 1590, 1594(a) and 1594(b).

54. Plaintiff and other class members suffered damages as a result of Defendants' actions.

55. Plaintiff and other class members are entitled to compensatory and punitive damages.

## COUNT II – 18 U.S.C. 1594(b)

56. The preceding paragraphs are realleged as though stated in full herein.

57. Defendants conspired with one another to violate 18 U.S.C. §§ 1589 and 1590.

58. Defendants agreed to obtain the labor and services of plaintiff and class members by means of the abuse or threatened abuse of law or legal process, including, but not limited to, the use or threatened use of a law or legal process in order to exert pressure on plaintiff and other class members to continue working for the defendant or refrain from seeking employment elsewhere.

59. Defendants agreed to provide and obtain the labor and services of the class by means of serious harm and threats of serious harm to plaintiffs and class

members including, but not limited to, psychological, financial, or reputational harm that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

60. Defendants agreed to provide labor or plaintiffs and class members by means of a scheme, pattern, or plan intended to cause plaintiffs and other members of the class to believe that if they did not perform such labor or services, they would suffer serious harm, including, but not limited to, psychological, financial, or reputational harm that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

61. Defendants agreed to benefit, financially or by receiving other value, from participation in a venture which has engaged in the providing or obtaining of labor or services by the means described above, knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by such means.

62. Defendants agreed to recruit, transport, provide and obtain plaintiff and members of the class for labor or services in violation of 18 U.S.C. §§ 1589 and 1590.

63. Each of the defendants engaged in at least one overt act in furtherance of the conspiracy, including Recruiting plaintiffs and other class members in the Philippines to work for the defendant in this district, and after their arrival in the United States warned them of the serious harm they would suffer if they attempted to stop working for the defendants or to seek employment elsewhere.

64. Each of the defendants intentionally engaged in these acts and additional acts in furtherance of their agreed plan to deny plaintiffs and class members the compensation they were entitled to under their employment agreements and thereafter used legal process to recoup the compensation that had been paid to plaintiff and class members.

65. Plaintiff and class members suffered damages as a result of the Defendants conspiracy.

66. Defendants are, therefore, liable to plaintiffs and other class members.

## COUNT III – 18 U.S.C. § 1594(a)

67. The preceding paragraphs are realleged as though stated in full herein.

68. Defendants attempted to violate 18 U.S.C. §§ 1589 and 1590.

69. Plaintiff and other class members suffered damages as a result of the Defendants' attempts to violate 18 U.S.C. §§ 1589 and 1590.

70. Defendants are, therefore, liable for plaintiff and class members damages.

## COUNT V – § 27-1-755, Mont. Code Ann.

71. The preceding paragraphs are realleged as though set forth in full hereunder.

72. The actions as outlined above constitute human trafficking and violate §§ 45-5-702 and/or 45-5-703, Mont. Code Annotated.

73. This gives rise to civil action pursuant to § 27-1-755, Mont. Code Ann.

74. As a result, Plaintiff and class members are entitled to compensatory damages, punitive damages, injunctive relief and any other appropriate relief.

## COUNT IV – Declaratory Judgment

75. The preceding paragraphs are realleged as though stated in full herein.

76. The venue and conflict of laws provisions of the contract are not enforceable because they are unconscionable and not within the reasonable expectations of the parties.

77. The contract provides that any case must be brought in Minnesota and based on Minnesota laws. However, plaintiffs and class members were never made aware of these provisions when agreeing to work in Montana, and were not shown the contracts until after they began working.

78. The venue and conflict of laws provisions are also of the same type size and font as the remainder of the contract. There is nothing that particularly highlights them.

79. As such, the venue and choice of law provisions are not within the reasonable expectations of the plaintiff and class members and are also unconscionable.

## Jury Demand

Pursuant to Mont. R. Civ. P. 38, Plaintiff and class members hereby demand a trial by jury.

Dated this 11th day of May, 2021.

MORRISON, SHERWOOD, WILSON, DEOLA

By: _____
Robert Farris-Olsen