IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| JEE IRENE ESTAVILLA, individually, and on behalf of all similarly situated individuals, | CV 21-68-M-KLD |
| Plaintiffs, | ORDER |
| vs. | |
| THE GOODMAN GROUP, LLC; COMMUNITY NURSING INC., d/b/a THE VILLAGE HEALTH & REHABILITATION f/k/a THE VILLAGE HEALTH CARE CENTER and JOHN DOES 1-10, | |
| Defendants. | |

This matter comes before the Court on Defendants The Goodman Group, LLC ("Goodman") and Community Nursing Inc., d/b/a The Village Health & Rehabilitation f/k/a The Village Health Care Center's ("Village Health") (collectively "Defendants") motion to dismiss Plaintiff Jee Irene Estavilla's ("Estavilla") Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants' motion is granted for the reasons discussed below.

## I.   **Background**[1]

Village Health is a skilled nursing facility located in Missoula, Montana and is a subsidiary of Goodman, which manages The Village and several other senior communities across the United States. (Doc. 5, at ¶¶ 2-3). Estavilla, a citizen of the Republic of the Philippines, is a registered nurse and former employee of Village Health. (Doc. 5, at ¶ 1).

On August 19, 2015, Village Health sent a conditional offer of employment to Estavilla, who was residing at the time in Cebut City, Philippines. ("Offer Letter") (Doc. 5, at ¶ 6; Doc. 9-1). Village Health offered Estavilla employment as a registered nurse at its Missoula facility, with a base compensation rate of $25.52 per hour. (Doc. 5, at ¶ 7; Doc. 9-1, at 2). The Offer Letter advised Estavilla that in order for her to be eligible for employment, Village Health would need to sponsor her as an employment-based immigrant and she would have to meet the immigration requirements of the United States. (Doc. 5, at ¶ 8; Doc. 9-1, at 3). Village Health also agreed to advance other compensation and costs, including: (1) an initial incentive payment in the amount of $1,000; (2) meals, lodging, and utilities for the first three months of Estavilla's employment; and (3) the costs

---

[1] Consistent with the legal standards applicable to Rule 12(b)(6) motions, the following facts are taken from the Complaint, evidence on which the Complaint necessarily relies, and state court documents of which this Court may take judicial notice.

associated with Estavilla's immigration to the United States. (Doc. 5, at ¶¶ 10-11; Doc. 9-1, at 3-4).

The Offer Letter explained that Village Health would "expend in excess of $20,000.00 USD to enable you to have this employment opportunity," with the "specific figure for the Advanced Amount [to] be determined following your completion of the RN Onboarding Program and any additional worksite orientation at the Facility." (Doc. 9-1, at 4-5). The Offer Letter further advised Estavilla that the Advanced Amount "is considered an advancement," but one half of the Advanced Amount would be forgiven after two years of employment with Village Health, and the remainder would be forgiven if she remained employed with Village Health for three years. (Doc. 5, at ¶ 12; Doc. 9-1, at 5).

Also relevant here, the Offer Letter stated that "failure to make restitution or meet any of your obligations under the terms of this letter" would be reported "to the Department of Labor, Immigration and Naturalization Service and/or Immigration and Customs Enforcement Agency under applicable immigration fraud statutes." (Doc. 9-1, at 6). In addition, the Offer Letter contained a non-compete clause stating that if Estavilla did not remain employed for three years, she agreed that she would not work for "any health care or assisted living facility" in Montana "for a period of twelve (12) months after termination of employment. (Doc. 5, at ¶ 39; Doc. 9-1, at 6).

Estavilla signed the Offer Letter on August 21, 2015, and Village Health reaffirmed the offer on or about July 3, 2017. (Doc. 5, at ¶ 17; Doc. 9-1, at 2 & 7). Estavilla moved to Montana and began working for Village Health on or about November 6, 2017. (Doc. 5, at ¶ 18).

Estavilla's obligation to repay the Advanced Amount was documented in a promissory note in the amount of $26,642.47. ("Promissory Note") (Doc. 9-2). Estavilla alleges Village Health forced her to sign the Promissory Note, which contained provisions similar to those set forth in the Offer Letter. (Doc. 5, at ¶ 19). Estavilla further alleges that she signed the Promissory Note about three months after she moved to Montana, but at the request of Village Health she back-dated it to November 6, 2017. (Doc. 5, at ¶ 20). Estavilla claims "this was the first time she learned that the funds were considered an 'advance' and not a gift or other consideration for her to uproot her life in the Philippines and move to Montana." (Doc. 5, at ¶ 20).

Estavilla worked for Village Health until May 24, 2019, when her employment was terminated. (Doc. 5, at ¶ 21). Because Estavilla was terminated after having worked for only 18 months, Village Health demanded that Estavilla repay the Advanced Amount in full. (Doc. 5, at ¶ 24). Estavilla was unable to pay that amount, and in early October 2019 Village Health commenced a lawsuit

against her in Minnesota state court (the "Previous Litigation").[2] (Doc. 5, at ¶ 24; Doc 9-4; Doc. 9-5). Village Health asserted claims against Estavilla for breach of contract and, alternatively, for unjust enrichment. (Doc. 9-4). Estavilla, who was proceeding pro se at the time, answered and counterclaimed for wrongful termination of contract. (Doc. 9-5). She also alleged affirmative defenses of "failure of consideration" and "discrimination and harassment." (Doc. 9-5). Village Health prevailed on summary judgment, and on March 12, 2020 the Minnesota court entered judgment against Estavilla in the total amount of $28,353.45. (Doc. 9-6). In doing so, the court determined that the Offer Letter was a "valid, binding contract" and that Estavilla's counterclaim was not supported by any evidence. (Doc. 9-6).  Estavilla did not appeal this decision.

On May 11, 2021, Estavilla filed this putative class action in Montana state court on behalf of herself and others similarly situated. (Doc. 5). Defendants removed the case to this Court on June 3, 2021 based on federal question jurisdiction and diversity jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 1441. (Doc. 1). Estavilla alleges federal forced labor and trafficking claims

---

[2] The Offer Letter contained a choice of venue provision making Minnesota the proper venue for the Previous Litigation, and a choice of law provision stating that "the rights of the parties under this Offer Letter will be governed by, interpreted, and enforced in accordance with the laws of the State of Minnesota…. (Doc. 9-1, at 6).

pursuant to the civil remedies provision of the Trafficking Victims Protection

Reauthorization Act ("TVPA"), 18 U.S.C. §§ 1589, 1590, 1594(a)(b), 1595. (Doc.

5, at 11-15). Estavilla additionally alleges state law claims under Mont. Code Ann.

§ 27-1-755, which permits a civil action under Montana's criminal statutes

prohibiting human trafficking and involuntary servitude, Mont. Code Ann. §§ 45-

5-702 and 45-5-703. (Doc. 5, at 16). Estavilla's Complaint also includes a

declaratory judgment claim seeking a determination that the contractual venue and

choice of law provisions contained in the Offer Letter are unenforceable. (Doc. 5,

at 16).

Defendants move to dismiss under Rule 12(b)(6) on the ground that the

Complaint fails to state a claim for relief.

## II.     <u>Legal Standard</u>

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a

complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A cause of action

may be dismissed under Fed. R. Civ. P. 12(b)(6) either when it asserts a legal

theory that is not cognizable as a matter of law, or if it fails to allege sufficient

facts to support an otherwise cognizable legal claim. *SmileCare Dental Group v.*

*Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996). When

reviewing a Rule 12(b)(6) motion to dismiss, the court is to accept all factual

allegations in the complaint as true and construe the pleading in the light most

favorable to the nonmoving party. *Hospital Bldg. Co. v. Trustees of the Rex Hospital*, 425 U.S. 738, 740 (1976); *Tanner v. Heise*, 879 F.2d 572, 576 (9th Cir. 1989).

The court's review under Rule 12(b)(6) is informed by the provision of Fed. R. Civ. P. 8(a)(2) which requires that "a pleading must contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft*, 129 S.Ct. at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must offer more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action...'" *Ashcroft*, 129 S.Ct. at 1249 (quoting *Twombly*, 550 U.S. at 555).

To withstand a motion to dismiss under Rule 12(b)(6), "the plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) (quoting *Twombly*, 127 S.Ct. at 1974). This means that the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 129 S.Ct. at 1949. But if the complaint "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory,"

then dismissal under Rule 12(b)(6) is appropriate.  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

"[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *National Association of the Advancement of Psychoanalysis, v. California Board of Psychology*, 228 F.3d 1043, 1049 (9th Cir. 2000) (citing *Halkin v. VeriFone, Inc.,* 11 F.3d 865, 868 (9th Cir. 1993). Additionally, "the court is not required to accepts legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.2d 752, 754-55 (9th Cir. 1994).

As a general rule, "a court may not consider material beyond the complaint in ruling on a Fed. R. Civ. P. 12(b)(6)  motion." *Intri-Plex Technologies, Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007). But the court "may consider evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Daniels-Hall v. National Education Assoc.*, 629 F.3d 992, 998 (9th Cir. 2010) (citations omitted). In addition, a court may consider "matters of which a court may take judicial notice" when ruling on Rule 12(b)(6) motion. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  This includes matters of

public record, such as publicly-filed pleadings in other judicial proceedings. See

*Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001); *Duckett v.*

*Godinez*, 67 F.3d 734, 741 (9th Cir. 1995).

Under these standards, the Offer Letter, Promissory Note, and Minnesota

state court pleadings submitted with Defendants' motion are properly considered

by the Court in determining whether the Complaint states a claim for relief.[3]

## III.   Discussion

Defendants maintain that Estavilla fails to state a claim for relief because:

(1) the claims alleged in the Complaint were compulsory counterclaims that she

should have asserted in the Minnesota state court litigation; and (2) the Complaint

does not adequately allege the elements necessary to state a claim for relief under

the TVPA or Montana law.

### A.   Compulsory Counterclaims

As defined in Federal Rule of Civil Procedure 13(a), a compulsory

counterclaim is "any claim that – at the time of its service – the pleader has against

an opposing party if the claim: (A) arises out of the transaction or occurrence that

is the subject matter of the opposing party's claim; and (B) does not require adding

another party over whom the court cannot acquire jurisdiction."  The purpose of

---

[3] The Court need not, and does not, consider the newspaper article Defendants have submitted as an exhibit in support of their motion. (Doc. 9-7).

Rule 13(a) is "to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters." *Southern Construction Co. v. Pickard*, 371 U.S. 57, 60 (1962).  A party who fails to plead a compulsory counterclaim is held to have waived the claim and is precluded by principles of res judicata from later asserting the claim in separate litigation.[4] *Local Union No. 11, International Brotherhood of Electrical Workers, AFL-CIO v. G.P. Thompson Electric, Inc.*, 363 F.2d 181, 184 (9th Cir. 1966).

Whether a claim is a compulsory counterclaim that should have been pled in an earlier state court action is a question of state law. *Pochiro v. Prudential Ins. Co.*, 826 F.2d 1246, 1249 (9th Cir. 1987). Because Village Health brought the Previous Litigation in Minnesota state court, whether Estavilla's claims are compulsory counterclaims that she has waived by failing to plead them in the Previous Litigation is governed by Minnesota law. See *Pochiro*, 826 F.2d at 1249.

Minnesota Rule of Civil Procedure 13.01 on compulsory counterclaims provides in relevant part that "[a] pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing

---

[4] The rule is the same in the Eighth Circuit, which encompasses Minnesota. See *Nelson v. Repossessors, Inc.*, 2018 WL 1891494, at *2 (D. Minn. Apr. 20, 2018) ("A compulsory counterclaim that is not brought is waived in subsequent litigation.") (citing *Schinzing v. Mid-States Stainless, Inc.* 415 F.3d 807, 813 (8th Cir. 2005))

party, if it arises out of the transaction that is the subject matter of the opposing party's claim ...." Minn. R. Civ. P. 13.01. Minnesota Rule 13.01 is different from its federal counterpart, Fed. R. Civ. P. 13(a), in one material respect: it refers to counterclaims arising out of "the transaction" that is the subject of the opposing party's claim, while the federal rule refers more broadly to counterclaims arising out of the same "the transaction or occurrence." Fed. R. Civ. P. 13(a)(1). As initially drafted, Minnesota Rule 13.01 would have followed the federal rule and referred to counterclaims arising out of the same "transaction or occurrence." *House v. Hanson*, 72 N.W. 2d 874, 877-78 (Minn. 1955). After further consideration, however, the Minnesota Supreme Court's advisory committee "revised the tentative draft of Rule 13.01 by substituting for the words 'transaction or occurrence' the words 'contract or transaction'." *House*, 72 N.W.2d at 878. Consistent with the advisory committee's recommendation, the Minnesota Supreme Court approved Rule 13.01 in its final version, which describes compulsory counterclaims as those arising from the "transaction" that is the subject matter of the opposing party's claim. *House*, 72 N.W.2d at 878.

   *House* is the seminal Minnesota Supreme Court case addressing application of Minnesota Rule 13.01. *House* considered the legal issue of whether under Rule 13.01 "a defendant in a tort action arising out of an automobile collision must interpose as a counterclaim any claims he has against the plaintiff which arise out

of the same collision or be forever barred from asserting them in another suit."
*House*, 72 N.W.2d at 875. After considering the drafting history, the Minnesota
Supreme Court held "that the word 'transaction' as used in Rule 13.01 does not
embrace claims in tort and that therefore the failure of a defendant to assert as a
counterclaim any claim he has against the plaintiff does not estop him from
asserting such claim in an independent action against the plaintiff." *House*, 72
N.S.2d at 878.

Minnesota's intermediate appellate courts have since split on the issue of
whether, under *House*, counterclaims that sound in tort can be compulsory
counterclaims under Rule 13.01.[5] Compare *Leiendecker v. Asian Women United of
Minnesota*, 731 N.W.2d 836 (Minn. Ct. App. 2007) (concluding that tort
counterclaims are always permissive and cannot be compulsory); *St. Stephen State
Bank v. Johannsen*, 2003 WL 1875500 (Minn. Ct. App. 2003) (concluding that
while tort counterclaims cannot be compulsory in a tort action, they may be
compulsory in a non-tort action).

In *Liendecker*, the Minnesota Court of Appeals concluded based on its
reading of *House* "that the word 'transaction' in rule 13.01 does not embrace

---

[5] As directed by the Court, the parties have submitted supplemental briefing
addressing the impact, if any, of *Liendecker* and *St. Stephen* on the issue of
whether Estavilla's TVPA claims can be considered compulsory counterclaims in
the Previous Litigation under Minnesota Rule 13.01.

counterclaims in tort, whether the prior action was a tort action or a non-tort action." *Liendecker*, 731 N.W.2d at 840. "Instead, the Minnesota version of rule 13.01 provides a blanket exclusion for tort counterclaims." *Liendecker*, 731 N.W.2d at 840. Thus, *Liendecker* effectively held that tort counterclaims are always permissive, and can never be compulsory under Rule 13.01.

In *St. Stephen,* the Minnesota Court of Appeals read *House* differently and rejected the argument that tort counterclaims cannot be compulsory counterclaims under Rule 13.01. *St. Stephen*, 2003 WL 1875500, at *2. *St. Stephen* interpreted *House* as holding "that the word 'transaction,' as used in rule 13.01, does not embrace claims in tort, therefore a defendant's failure to assert as a counterclaim, *in a tort action*, any claim defendant has against plaintiff does not estop defendant from asserting such claim in a subsequent action against plaintiff. *St. Stephen*, 2003 WL 1875500, at *2 (emphasis in original). The *St. Stephen* court found that the appellants were "misread[ing] *House* to say that counterclaims that sound in tort are never compulsory counterclaims," when in fact what "*House* actually says [is] that there are no compulsory counterclaims in a tort action." *St. Stephen*, 2003 WL 1875500, at *2.

The Court agrees with *St. Stephen*'s interpretation of *House*, which is consistent with plain language of Rule 13.01. Under the Minnesota rule, a counterclaim is compulsory "if it arises out of the transaction that is the subject

matter of the opposing party's claim." Minn. R. Civ. P. 13.01. *House* held that "the word 'transaction' as used in rule 13.01 does not embrace claims in tort," which means that a defendant's failure to assert a counterclaim in a tort action does not preclude the plaintiff from later asserting the claim in an independent action against the plaintiff. *House*, 72 N.W.2d at 878. Under *House*, whether the original action is a tort action or non-tort action is certainly relevant to whether a claim can be considered compulsory under Rule 13.01. Whether the counterclaim itself sounds in tort, however, is immaterial. *House* did not consider whether the counterclaims at issue sounded in tort, and it does not appear that the Minnesota Supreme Court has ever applied Rule 13.01 to hold that a counterclaim is not compulsory if it sounds in tort.

Because it is consistent with *House* and the plain language of Rule 13.01, the Court follows the *St. Stephen* court's reasoning. The fact that Estavilla's TVPA claims sound in tort does not mean they were necessarily permissive in the Previous Litigation, which was not a tort action. See e.g. *Rydberg Land, Inc. v. Pine City Bank*, 1989 WL 1551 (Minn. Ct. App. 1989) (affirming trial court's ruling that mortgagor's tort claims were compulsory counterclaims that should have been asserted in the original foreclosure action and were therefore barred by Rule 13.01). Thus, the Court will consider whether Estavilla's TVPA claims were compulsory counterclaims under the applicable test.

Minnesota courts have not established a test for interpreting the language of Minnesota's compulsory counterclaim rule, and thus look to federal caselaw interpreting Federal Rule of Civil Procedure 13(a) for guidance. *Bank of New York Mellon v. Kieran*, 2016 WL 4421302, at *4 (Ct. App. Minn. Aug. 22, 2016). The Eighth Circuit has previously identified four tests federal courts have applied in determining whether a counterclaim arises out the same transaction or occurrence: (1) whether the issues of fact and law raised by the claim and counterclaim are largely the same; (2) whether res judicata would bar a subsequent suit on the defendant's claim absent the compulsory counterclaim rule; (3) whether substantially the same evidence will support or refute the plaintiff's claim as well as the defendant's counterclaim; and (4) whether there is a logical relation between the claim and counterclaim. *Tullos v. Parks*, 915 F.2d 1192, 1195 & n. 8 (8th Cir. 1990) (citing *Cochrane v. Iowa Beef Processors, Inc.*, 596 F.2d 254, 264 (8th Cir. 1979)) In *Tullos*, the Eighth Circuit agreed "with the majority of the federal courts that the logical relation test provides the needed flexibility for applying Rule 13(a)." *Tullos*, 915 F.2d at 1195 (citing Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1410 at 61-65 (2d ed. 1990)).

As the *Mellon* court thus recognized, the Eighth Circuit  generally prefers the logical relation test to determine if a counterclaim is compulsory. *Mellon*, 2016 WL 4421302, at *4 (citing *Tullos v. Parks*, 915 F.2d 1192, 1195 (8th Cir. 1990)).

"Under the logical-relation test, courts ask whether a counterclaim stems from the same 'aggregate of operative facts' as the original claim." *Mellon*, 2016 WL 4421302, at *4 (quoting *Popp Telcom v. Am. Sharecom, Inc.*, 210 F.3d 928, 941 (8th Cir. 2000).

The Ninth Circuit also applies "the logical relationship test for compulsory counterclaims." *Mattel, Inc. v. MGA Entertainment, Inc.*, 705 F.3d 1108, 1110 (9th Cir. 2013) (quoting *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1195-96 (9th Cir. 2005)). Thus, Ninth Circuit caselaw is instructive for purposes of determining whether Estavilla's claims are compulsory counterclaims that should have been pled in the Previous Litigation.

Much like the Eighth Circuit, the Ninth Circuit has said that that "[a] logical relationship exists when the counterclaim arises from the same aggregate set of operative facts as the initial claim, in that the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights otherwise dormant in the defendant." *Mattel*, 394 F.3d at 1196 (quoting *In re Pegasus Gold Corp.*, 394 F.3d at 1196).

Defendants argue the logical relation test is satisfied here because the claims alleged in the Complaint and the claims litigated in the Previous Litigation are all based on the same set of operative facts, specifically, Estavilla's employment with Village Health and the terms of the Offer Letter and Promissory Note. To illustrate

their argument, Defendants compare the complaints in both lawsuits and note that both pleadings extensively refer to and quote the terms of the Offer Letter and Promissory Note. As Defendants point out, every factual allegation in Village Health's complaint in the Previous Litigation either: (a) references or quotes the Offer Letter or Promissory Note (Doc. 9-4, at ¶¶ 3, 4, 7, 8, 9, 11, 13, and 14); (b) describes when Estavilla began and ended her employment with Village Health (Doc. 9-4, at ¶¶ 5, 10, and 12); or (c) references that Village Health sponsored Estavilla for employment-based immigration to the United States (Doc. 9-4, at ¶ 6).

Estavilla's Complaint contains similar factual allegations. For example, Defendants note that in the section setting forth the facts specific to Estavilla as the named plaintiff, nearly every factual allegation is derived from what is set forth in the Offer Letter (Doc. 5, at ¶¶ 6-17) or outlines language from the Promissory Note (Doc. 5, at ¶¶ 19-20). The few remaining allegations in this section of the Complaint relate to whether Village Health terminated Estavilla for cause. (Doc. 5, at ¶¶ 21-23). The Complaint also contains a section setting forth the facts common to all claims. (Doc. 5, at 6-9). While the factual allegations in this section relate more generally to the foreign nurse sponsorship program, nearly all of them are based on what is set forth in the Offer Letter or Promissory Note. (Doc. 5, at ¶¶ 28-41).  Focusing on the substantial overlap in the underlying facts alleged in both pleadings, Defendants take the position that Estavilla's claims are barred because

they should have been brought as compulsory counterclaims in the Previous Litigation.

Estavilla makes three arguments in response. First, she maintains that Goodman cannot be dismissed because it was not a party to the Previous Litigation, which means she could not have asserted a counterclaim against it. Next, Estavilla contends that her claims in this case are based on a significantly broader set of aggregate operative facts, and so were permissive rather than compulsory counterclaims in the Previous Litigation. Finally, Estavilla argues that to the extent her human trafficking claims allege actual, rather than threatened, serious harm and abuse of legal process, they cannot be considered compulsory counterclaims because they did not exist until the Previous Litigation ended.

### 1.    Rule 13.01's "Opposing Party" Requirement

Estavilla first argues that her claims against Goodman cannot be considered compulsory counterclaims under Rule 13.01 because Goodman was not a party to the Previous Litigation. Again looking to federal court decisions for guidance, Defendants counter that this unduly restrictive reading of Rule 13(a) and its reference to "any opposing party" has been rejected. Because it appears the Eighth and Ninth Circuits have not addressed the issue, Defendants cite the Third Circuit's decision in *Transamerica Occidental Life Ins. Co. v. Aviation of Am., Inc.*, for the proposition that "an unnamed party may be so closely identified with a named

party as to qualify as an 'opposing party' under Rule 13(a)." 292 F.3d 384, 390

(3d. Cir. 2002) (citing and following *Avemco Ins. Co. v. Cessna Aircraft Co.*, 11

F.3d 998 (10th Cir. 1993)). Likewise, "a party not named in litigation may still be

an opposing party for Rule 13 purposes in certain cases in which the party is

functionally identical to the actual opposing party named in the litigation."

*Transamerica*, 292 F.2d at 390 (citing and following *Banco Nacional de Cuba v.*

*National City Bank of New York*, 478 F.2d 191, 193 n. 1 (2d. Cir. 1973). The Third

Circuit reasoned that interpreting "opposing party" broadly would "give effect to

the policy rationale of judicial economy underlying Rule 13."   *Transamerica*, 292

F.3d at 391

      The Court finds this reasoning persuasive, particularly in light of the fact

that there does not appear to be any authority to the contrary in the Eighth or Ninth

Circuits. Here, Estavilla's Complaint alleges that Goodman manages Village

Health, and that Village Health is "a subsidiary of the Goodman Group." (Doc. 5,

at ¶¶ 2-3). Throughout the Complaint, Estavilla alleges conduct by "the

Defendants" collectively and does not differentiate between the actions of Village

Health and Goodman. Taking the allegations in the Complaint as true, Goodman is

so closely identified with Village Health that it is properly considered an

"opposing party" within the meaning of Rule 13 and Minnesota Rule 13.01.

Again citing *Transamerica*, Defendants further argue that the doctrine of res judicata supports application of the compulsory counterclaim rule to Goodman. In *Transamerica,* the Third Circuit found that the doctrine of res judicata provided additional support for its approach, noting "the close connection" between Rule 13(a) and doctrine of claim preclusion. *Transamerica*, 292 F.2d at 39. The Eighth and Ninth Circuits have also recognized the connection between Rule 13(a) and concepts of res judicata. See e.g. *G.P. Thompson Electric, Inc.*, 363 F.2d at 184 (a party who fails to plead a compulsory counterclaim is precluded by principles of res judicata from later asserting the claim in separate litigation); *Tullos*, 915 F.2d at 1195 n. 8 (noting that one test traditionally used by the Eighth Circuit to determine if a counterclaim is compulsory asks whether res judicata would bar a subsequent suit on the counterclaim).

The doctrine of "[r]es judicata, or claim preclusion, prevents relitigation of claims that were raised, or could have been raised, in prior actions between the same parties or their privies." *Benson v. Kemske*, 2020 WL 4783886, at * (D. Minn. Aug. 18, 2020). The fact that res judicata applies to both the named parties and their privies provides further support for interpreting "opposing party" to mean the named party and those in privity with it for purposes of Rule 13(a).  See e.g.*, Waldnew v. Bush*, 2006 WL 3312039, at 5 (D. South Dak. Nov. 13 2006) (describing res judicata as "the close relative of compulsory counterclaims" and

concluding that an "opposing party" for purposes of Rule 13(a) includes an unnamed party in privity with the named party in earlier litigation).

As stated above, taking the allegations in Estavilla's Complaint as true, Goodman and Village Health are in privity with one another. Accordingly, and for the reasons discussed above, the Court concludes that Goodman is an "opposing party" within the meaning of Rule 13(a) and Minnesota Rule 13.01.

2.    Permissive or Compulsory Counterclaims

Estavilla next argues that the human trafficking claims she alleges here are based on a on a significantly broader set of aggregate operative facts than those previously alleged by Village Health, and so are properly characterized as permissive counterclaims rather than compulsory counterclaims in the Previous Litigation.

Estavilla concedes there is some factual overlap between her current lawsuit and the Previous Litigation, but emphasizes that the allegations in her Complaint date back to 2015 and relate more broadly to Defendants' conduct in recruiting her, facilitating her move to the United States, employing her, terminating her, bringing suit and obtaining a judgment against her, and including an unenforceable non-compete clause in the Offer Letter. Estavilla contrasts the allegations in her Complaint with those made by Village Health in the Previous Litigation, which she characterizes as revolving around whether she was terminated for cause and what

damages she owed.  According to Estavilla, the difference in the breadth of her human trafficking claims is sufficient to establish them as permissive rather than compulsory counterclaims, notwithstanding that many of the facts and written documents at issue in both cases overlap.

For support, Estavilla relies on *Popp Telecom v. American Sharecom, Inc.*, 210 F.3d 928, 941 (8th Cir. 2000), which she cites for the proposition that claims dealing with a limited transaction do not render claims concerning a larger set of overlapping transactions compulsory counterclaims. In *Popp Telecom*, the Eighth Circuit applied the logical relationship standard to determine whether a fraud counterclaim was compulsory. *Popp Telecom,* 210 F.3d at 941. The fraud claim was based on the method employed by a corporation to secure funds to purchase stock, while the prior appraisal proceeding dealt with a limited transaction, i.e., the exchange of money for stock. *Popp Telecom,* 210 F.3d at 941. Because the basis of the fraud counterclaim was not a concern in the prior proceeding, the Eighth Circuit concluded the fraud counterclaim "was not compulsory and it did not 'arise out of the transaction' of the appraisal proceeding nor did it 'stem from the same aggregate of operative facts'."[6] *Popp Telecom,* 210 F.3d at 941.

---

[6] Notably, the court considered Minnesota Rule 13.01 and the "logical relation" in determining whether a fraud counterclaim arose from the "same aggregate of operative facts" or "out of the transaction" that was the subject of the original proceeding, without regard to the fact that the counterclaim at issue was a tort claim. *Popp*, 210 F.3d at 941. This bolsters the Court's conclusion above, that tort

Here, unlike *Popp Telecom*, the claims alleged in this action and in the Previous Litigation all stem from the same written agreements and core set of operative facts. The breach of contract and unjust enrichment claims asserted in the Previous Litigation stemmed from Estavilla's failure to reimburse Village Health for the Advanced Amount as required under the terms of the Offer Letter and Promissory Note. Estavilla's human trafficking claims are based on Estavilla's employment with Village Health as documented in the Offer Letter and Promissory Note. As a comparison between the two pleadings reflects, the claims alleged in this case and those litigated in the Previous Litigation all relate to Estavilla's employment with Village Health and, more specifically, the terms of the Offer Letter and Promissory Note and surrounding circumstances.

While the legal theory upon which Estavilla's human trafficking claims are premised is certainly different from the contractual legal theories advanced by Village Health in the Previous Litigation, the claims all arise from the same aggregate set of operative facts involving Estavilla's employment and the terms of the Offer Letter and Promissory Note. When applying the logical relation standard, "[t]he focus is on the similarity of the facts upon which the claims are premised, rather than the legal theory advanced by the parties. *Mattel*, 705 F.3d at 1110. In

---

counterclaims can be considered compulsory under Minnesota Rule 13.01 if they meet the applicable test.

other words, "[w]hat matters is not the legal theory, but the facts." *Mattel*, 705 F.3d at 1110. In *Mattel*, the Ninth Circuit held the fact that the parties may advance the same legal theory is not enough to make a counterclaim compulsory. Here, the opposite is true. The claims raised in Estavilla's Complaint and in the Previous Litigation advance different legal theories based on the same aggregate core set of facts.

Estavilla also relies on *Paguarian v. Prompt Nursing Employment Agency, LLC,* 827 F. App'x 116 (2d. Cir. 2020) (*Paguarian III*) to support her argument that her trafficking claims were not compulsory counterclaims in the Previous Litigation. In *Paguarian III,* the defendant companies recruited the plaintiff, a Filipino nurse, to come to the United States to work in New York-based nursing homes. *Paguarian III*, 827 F. App'x at 117. After working at one of the defendant nursing homes for nine months, the plaintiff quit and filed a class action suit alleging the defendants underpaid their nurses and violated federal human trafficking laws. *Paguarian III*, 827 F. App'x at 117. On the parties' subsequent cross-motions for summary judgment, the district court determined, "among other things, that (i) the nurses were paid below their contractually guaranteed amount, (ii) the liquidated damages provision in the nurses' contracts was an unenforceable penalty, and (iii) the use of that liquidated damages provision violated federal anti-trafficking laws." *Paguarian III*, 827 F. App'x at 117-18. The district also "entered

a declaratory judgment that the liquidated damages clause was unenforceable and an injunction preventing Defendants from enforcing or threatening to enforce the liquidated damages clause against any class member." *Paguarian III*, 827 F. App'x at 118.

On appeal by the defendants, it was undisputed that the Second Circuit had jurisdiction to review the district court's decision concerning the liquidated damages provision because it was inextricably intertwined with the injunction. *Paguarian III*, 827 F. App'x at 118. At issue was whether the Second Circuit had pendent appellate jurisdiction over the plaintiff's federal trafficking claim. *Paguarian III*, 827 F. App'x at 118.  Under Second Circuit law, pendent appellate jurisdiction is reserved for "exceptional circumstances," which "exist only when the unappealable issue is either 'inextricably intertwined with' or must be decided to 'ensure meaningful review' of the appealable issue." *Paguarian III*, 827 F. App'x at 118.

 The Second Circuit held this standard was not satisfied because the plaintiff's federal trafficking claim was "neither inextricably intertwined with, nor necessary to decide, the liquidated damages issue." *Paguarian III*, 827 F. App'x at 118.  While the court agreed that the topics were "related, since the illegality of the damages provision was the catalyst for the district court's decision that several of the Defendants had violated anti-trafficking laws," the court found there was no

sound basis for taking pendent jurisdiction over the federal trafficking claim

because it was not necessary to decide that claim before reviewing the district

court's decision concerning the liquidated damages provision. *Paguarian III*, 827

F. App'x at 118.

 *Paguarian III* is not particularly helpful here, however, because it addressed

the standard for pendent appellate jurisdiction and did not involve any compulsory

counterclaim issues or apply the logical relationship test. The issue here is not

whether Estavilla's trafficking claims are inextricably intertwined with Village

Health's breach of contract and unjust enrichment claims, but rather whether the

claims all stem from the set of operative facts. In addition, as discussed at greater

length below, the factual and legal scenario in the *Paguarian* litigation is

materially distinguishable from the circumstances presented here for several

reasons.

 To the extent Estavilla also relies on *Javier v. Beck*, 2014 WL 3058456 (S.D.

N.Y. July 3, 2014), that case is similarly distinguishable. In *Javier*, the plaintiff

signed an employment agreement providing, among other things, that defendants

would take all reasonable steps to obtain authorization for the plaintiff to work in

the United States and would pay all fees associated with his visa application.

*Javier*, 2014 WL 3058456, at *1. The plaintiff later sued the defendants, alleging

that they charged him thousands of dollars for visa application fees, required that

he sign a confession of judgment for $15,000 as a condition of employment, threatened that if he left their employment for any reason he would be forced to pay them $15,000, and threatened to withdraw their visa petition on his behalf if he questioned their conduct or refused to work as assigned. *Javier*, 2014 WL 3058456, at *2. The plaintiff asserted asserted several claims, including claims for violations of the TVPA, breach of contract, and unjust enrichment. *Javier*, 2014 WL 3058456, at *1.

In holding that the plaintiff had sufficiently pled a claim under the TVPA, the court observed that "[r]egardless of whether the contract was enforceable, the Complaint alleges that the Defendants used it as a threat to obtain [the plaintiff's] continued services." *Javier*, 2014 WL 3058456, at *2. Estavilla relies on this observation by the court to support her argument that her TVPA claims are not compulsory counterclaims because they do not involve the same set of operative facts as the breach of contract and unjust enrichment claims asserted by Village Health in the Previous Litigation. As with *Paguarian III*, however, *Javier* is largely inapposite because it did not involve the logical relationship test for compulsory counterclaims.

Here, the Court finds that the trafficking claims alleged in the Complaint and the claims litigated in the Previous Litigation all stem from the same aggregate set of operative facts involving Estavilla's employment with Village Health and the

terms of the Offer Letter and Promissory Note, as required to make them compulsory counterclaims.

        3.    <u>Ripeness</u>

Finally, Estavilla argues that to the extent her human trafficking claims allege actual, rather than threatened, serious harm and abuse of legal process, they cannot be considered compulsory counterclaims because they did not exist until the Previous Litigation ended.

Minnesota's compulsory counterclaim rule provides in part that "[a] pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party…." Minn. R. Civ. P. 13.01. This rule applies "only if the claim is ripe, i.e., if the claim is mature in the sense that a cause of action exists for which a lawsuit may properly be commenced." *Leiendecker v. Asian Women United of Minn.*, 731 N.W.2d 836, 841 (Minn. App. 2007). The federal compulsory counterclaim rule is similar in that it applies to "any claim that – at the time of its service – the pleader has against an opposing party…." Fed. R. Civ. P. 13(a)(1). Whether a claim is mature for purposes of Fed. R. Civ. P. 13(a)(1) is synonymous with whether a claim has accrued for statute of limitations purposes. See e.g. *Cabrera v. Courtesy Auto, Inc.*, 192 F.Supp.2d 1012, 1015 (D. Neb. 2002).

As a general rule, under Minnesota law, "[a] cause of action accrues when all of its elements exist to the extent that the claim could withstand a motion to dismiss for failure to state a claim upon which relief can be granted." *Abarca v. Little*, 54 F.Supp.3d 1064, 1070 (D. Minn. 2014) *(*citing *Noske v. Friedberg*, 656 N.W.2d 409, 412 (Minn. Ct. App. 2003); see also *Hermann v. McMenomy & Severson*, 590 N.W.2d 641, 643 (Minn. 1999).

Estavilla emphasizes that her TVPA claims involve two timelines – one based on alleged threats presented in the contractual language and the other based on actual harm caused by Defendants and actual abuse of the legal process. Even if she waived her threat-based trafficking claims by failing to bring them as compulsory counterclaims in the Previous Litigation, Estavilla argues, she did not waive her actual serious harm and abuse of legal process claims because they did not mature, or accrue, until Village Health actually obtained a monetary judgment against her.

Estavilla advances several claims under the TVPA's civil remedies provision, 18 U.S.C. § 1595, including a forced labor claim under 18 U.S.C. § 1589. Section 1589 prohibits knowingly providing or obtaining the labor or services of a person by several means, including by means of "serious harm or threats of serious harm" and/or "the abuse or threatened abuse of law or legal process." 18 U.S.C. § 1589(a)(2) & (3). Estavilla argues § 1589 thus distinguishes

between "serious harm" and "threatened serious harm," and "abuse of law or legal process" and "threatened abuse of law or legal process."

Estavilla argues she did not actually suffer serious harm or abuse of legal process until the Previous Litigation was completed and judgment was entered against her, which means she could not have claims based on "serious harm" under the TVPA while the Previous Litigation was ongoing. Because those claims did not mature until after the Previous Litigation ended, Estavilla argues, they were not compulsory counterclaims.

While § 1589(a) imposes liability for existing and threatened serious harm and abuse of legal process, Estavilla does not provide a basis for distinguishing between the two under the circumstances. Estavilla does not dispute that she could have asserted a claim based on threatened serious harm and abuse of legal process while the Previous Litigation was pending. Estavilla does not explain how any additional claims she might have asserted under subsections (2) and (3) after the Previous Litigation ended would have involved any different legal theories or potentially exposed Defendants to any additional liability. Because Estavilla could have asserted forced labor claims under § 1589(a)(2) and (3) while the Previous Litigation was pending, those claims were mature for purposes of Minnesota Rule 13.01 and Fed. R. Civ. P. 13(a)(1).

## B.    TVPA Claims

Congress enacted the TVPA as part of the Victims of Trafficking and Violence Protection Act of 2000 "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." Pub. L. No. 106-386, § 102(a) (codified at 22 U.S.C. § 7101(a)). In doing so, Congress recognized that "the means used by modern-day traffickers 'are increasingly subtle'" *U.S. v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (quoting H.R.Rep. No. 106-939, at 10, 2000 U.S.C.C.A.N. 1380, 1392-93 (2000) (Conf. Rep.). Congress thus intended the TVPA "'to reach cases in which persons are held in a condition of servitude through nonviolent coercion.'" *U.S. v. Dann,* 652 F.3d 1160, 1169 (9th Cir. 2011) (quoting 22 U.S.C. § 7101(b)(13)). In 2003, Congress amended the TVPA to provide for civil liability against individuals who violate the TVPA. 18 U.S.C. § 1595.

Estavilla advances several claims under the TVPA's civil remedies provision, alleging that Defendants violated the TVPA's prohibitions against forced labor under § 1589, forced labor trafficking under § 1590, attempt to engage in these offenses under § 1594(a), and conspiracy to engage in these offenses under § 1594(b). Defendants argue these claims are subject to dismissal because Estavilla has not alleged sufficient facts to plausibly demonstrate that she was subjected to

forced labor, as required to state a claim for relief under §§ 1589, 1590, and §§ 1594(a) & (b) of the TVPA.

    1.    <u>Section 1589</u>

Section 1589 prohibits knowingly providing or obtaining the labor or services of a person by the following means:

    (1)    by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

    (2)    by means of serious harm or threats of serious harm to that person or another person;

    (3)    by means of the abuse or threatened abuse of law or legal process; or

    (4)    by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a). Estavilla does not allege that Defendants used any of the means specified in subsections (1) or (4) to obtain forced labor or services from her. Focusing instead on subsections (2) and (3), Estavilla claims that Defendants knowingly obtained her labor or services by means of "serious harm or threats of serious harm" and/or "the abuse or threatened abuse of law or legal process." 18 U.S.C. § 1589(a)(2) & (3).

    a.    *Serious harm or threats of serious harm*

In light of its stated purpose, the TVPA defines harm broadly as:

> as any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continued performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2). In other words, harm or threatened harm must be serious enough to compel a reasonable person in the victim's circumstances to continue working when she otherwise would have left. See e.g. *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011); *Lesnik v. Eisenmann SE*, 374 F.Supp.3d 923, 952 (N.D. Cal. 2019). In evaluating serious harm, courts must consider "all the surrounding circumstances." *Dann,* 652 F.3d at 1171.

Defendants take the position that the harm alleged by Estavilla does not rise to the level of serious harm or threatened serious harm within the meaning of the TVPA. Defendants list several examples of conduct and conditions that courts have found may constitute "serious harm or threats of serious harm" as defined in the TVPA, including: withholding or threatening to withhold payment for work performed; threats of deportation, arrest, or imprisonment; intolerable working or living conditions; extreme isolation; threats of retaliation for an employee voicing criticism; threats to allow visas to expire without renewal; threats to terminate employment when employees ask for reimbursement for housing fees; extortion; systemic fraud; and confiscating and withholding passports, identity documents, or immigration documents. (Doc. 8, at 27); citing *Echon v. Sackett*, 2017 WL

4181417, at *14 (D. Colo. Sept. 20, 2017); *Lesnik v. Eisenman SE*, 374 F.Supp.3d 923, 953 (N.D. Cal. 2019) ; *United States v. Dann*, 652 F.3d 1160, 1171 (9th Cir. 2011); *United States v. Djoumessi*, 538 F.3d 547, 552 (6th Cir. 2008); *United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008). Because nothing comparable is alleged here, Defendants argue, Estavilla fails to state a forced labor claim under § 1589(a)(2).

Estavilla responds that Defendants' argument is based on an outdated interpretation of human trafficking and ignores the plain language of the TVPA. It is well-settled that financial pressure, including the threat of financial harm, may constitute serious harm under the TVPA. See e.g. *Dann,* 652 F.3d at 1170-71; *Carmen v. Health Carousel,* LLC, 2021 WL 2476882, at *6 (S.D. Ohio June 17, 2021); *Paguirigan v. Prompt Nursing Employment Agency LLC,* 2018 WL 437799, at *8 (E.D. N.Y. Sept. 12, 2018) (*Paguirigan II)*; *Javier v. Beck*, 2014 WL 3058456, at *6 (S.D. N.Y. July 3, 2014); *Nunag -Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 790 F.Supp.2d 1134, 1144 (C.D. Cal. 2011). "To constitute 'financial harm' within the meaning of the TVPA," however, "the threatened harm must be in some way improper or illicit." *Carmen,* 2021 WL 2476882, at *6.

Focusing on the TVPA's reference to financial harm, Estavilla maintains the liquidated damages provision in the Offer Letter and the threat of liability under the Promissory Notes constituted a "threat of serious harm," and the judgment

subsequently entered against her in the Previous Litigation constituted actual "serious harm" within the meaning of § 1589. Estavilla argues this serious harm was further compounded by her at-will employment status, which allowed Defendants to terminate her employment at any time still collect the Advance Amount, as well as the Offer Letter's non-compete clause.

To support her position, Estavilla relies primarily on *Paguirigan* and *Carmen,* both of which involved Filipino nurses who were recruited to work at healthcare facilities in the United States and later brought suit under the TVPA. In *Paguirigan*, the employment contract at issue contained a liquidated damages provision that required nurses to pay a $25,000 contract termination fee if they left their jobs before the end of the contract term. *Paguirigan v Prompt Nursing Employment Agency,* 286 F.Supp.3d 430, 435 (E.D. N.Y. 2017) (*Paguirigan I).* The nurses were also required to execute a $25,000 confession of judgment in favor of their employer as a condition of employment before leaving the Philippines. *Paguirigan I,* 286 F.Supp.3d at 435.

On summary judgment, the district court determined, among other things, that the liquidated damages provision was an unenforceable penalty intended to operate as a means to compel performance, ensuring that the plaintiff and other nurses did not resign before the end of their contract terms. *Paguirigan II*, 2019 WL 4647648, at *19. Notably, the confession of judgment provision went even

35

further and "outright state[ed] that its purposes [was] to 'secure Employee's performance of the Employment Term.'" *Paguirigan II*, 2019 WL 4647648, at *19. The court also determined that the liquidated damages provision was an unenforceable penalty because the defendants' losses were ascertainable at the time of the contract, and the $25,000 did not bear a reasonable proportion to the probable loss, which the evidence demonstrated was only $4,435.50. *Paguirigan II*, 2019 WL 4647648, at *11.

Defendants argue that *Paguirigan* is distinguishable. Unlike the liquidated damages provision at issue in *Paguirigan*, which was for a set amount that bore no reasonable relation to the defendants' probable loss, the Advanced Amount at issue here was documented in a Promissory Note that Estavilla signed after she began working for Village Health. Defendants maintain that, unlike the liquidated damages provision in *Paguirigan*, the Advanced Amount represents the actual amounts Estavilla agreed to have Village Health advance on her behalf, and is a debt she voluntarily incurred for actual expenses. (Doc. 20, at 11). Importantly, Village Health prevailed in the Previous Litigation to enforce the repayment provisions of the Offer Letter and obtained a judgment requiring Estavilla to reimburse it for the actual amounts expended on her behalf. (Doc. 5, at ¶¶ 18-19*). This is quite unlike *Paguirigan,* where the defendants filed several lawsuits against nurses based on a liquidated damages provision that courts had previously found to

be unenforceable. For these reasons, the Court agrees with Defendant that the *Paguirigan* litigation is materially distinguishable.

The second case Estavilla relies on, *Carmen v. Health Carousel, LLC*, 2021 WL 2476882 (S.D. Ohio June 17, 2021), is also distinguishable. In *Carmen*, the plaintiff alleged that the defendant used a variety of tactics to compel her and other nurses to continue working, including: (1) requiring a nurse to leave temporary employer-supplied housing within 48 hours of the nurse's last shift; (2) including a non-compete clause in the employment contract prohibiting a nurse from seeking employment with any healthcare provider within 50 miles of the employer's facility for one year; (3) using a liquidated damages provision that did not specify a dollar figure and stated that if the nurse breaches the employment contract, the nurse shall pay an unspecified amount of liquidated damages "to be agreed upon" and "settled amicably" by the parties; (4) requiring nurses to sign a handbook upon arrival in the United States that revised provisions in the earlier employment contract, including stating that the any liquidated damages amount will be "due immediately and in full on or before the last day" of the nurse's employment; (5) including a provision in the same handbook stating that the employer will continue to be an advocate for immigration purposes only so "as long as the nurse remains in good standing" with the employer, thereby making the implied threat that the employer would advocate for negative immigration outcomes if the nurse left; (6)

implementing an "isolating no-gossip policy" between nurses; (7) purposeful delay in obtaining the nurse's permanent license. *Carmen*, 2021 WL 2476882, at **1-2; 6.

With the exception of the non-compete clause and immigration provision contained in the Offer Letter, Estavilla does not allege that Defendants engaged in any of the coercive tactics that the *Carmen* court found were sufficient to survive dismissal for failure to state a claim for relief under § 1589 of the TVPA. Notably, in *Carmen*, the plaintiff alleged in her complaint that she felt forced to continue working for the defendant because of the non-compete clause, and hesitated to terminate her employment because of the immigration provision in her employer's handbook. *Carmen*, 2021 WL 2476882, at *4. Estavilla makes no similar allegations here. Nor does she allege that Defendants enforced or threatened to enforce those provisions against her.  Unlike *Carmen*, Estavilla's allegations are based entirely on the contents of the Offer Letter and Promissory Note, which were held to be enforceable in the Previous Litigation.

Given the distinction between Estavilla's allegations and those made by the plaintiff in *Carmen,* Defendants argue that the standards articulated by the court in *Panwar v. Access Therapies, Inc.,* 2015 WL 1396599 (S.D. Ind. Mar. 25, 2015) should apply. The Court agrees. In *Panwar*, the defendants recruited the plaintiffs to work as physical therapists at a rehabilitation facility in the United States and

agreed to sponsor their visa applications. *Panwar*, 2015 WL 1396599, at *1. The plaintiffs "were required to sign employment agreements setting forth the terms of employment, as well as a separate promissory note corresponding with the contracts' liquidated damages/recovery of expenses provisions." *Panwar*, 2015 WL 1396599, at *2. The employment agreements provided that if an employee left employment before completing the contract term, the employee was required to pay the amount of the promissory note to reimburse the employer's expenses and lost revenues. *Panwar*, 2015 WL 1396599, at *2. Both plaintiffs alleged they were not paid the full amount they were entitled to under the contract, and that the defendants threatened them with enforcement of the promissory note. *Panwar*, 2015 WL 1396599, at *2.

One plaintiff also alleged that the defendant threatened him with loss of his visa and deportation.  *Panwar*, 2015 WL 1396599, at *2. The plaintiffs filed suit alleging, among other claims, that the defendants used a forced labor scheme in violation of the TVPA by means of threats of serious harm, including financial harm through enforcement of the promissory note, threats of visa revocation and deportation, and abuse of legal process. *Panwar*, 2015 WL 1396599, at *2.

The *Panwar* court found the plaintiffs' TVPA claims were problematic for a number of reasons, and granted summary judgment in favor of the defendants. *Panwar*, 2015 WL 1396599, at **3-5. Relevant here, the court found the plaintiffs'

claim that the liquidated damages provision and the promissory note constituted a threat of financial harm sufficient for a finding of liability under the TVPA was not supported by the evidence or the law. *Panwar*, 2015 WL 1396599, at **3-5. The court noted that the plaintiffs had not presented any evidence that the stipulated sums in the liquidated damages provisions of their employment agreements were grossly disproportionate to the losses the defendants were likely to incur if an employee terminated his contract early. *Panwar*, 2015 WL 1396599, at *4. Because the defendants had submitted evidence that the stipulated sums were proportionate to the loss likely to occur, the court upheld the liquidated damages provisions and refused to penalize the defendants "under the TVPA for practices which they are explicitly permitted to utilize under the relevant laws." *Panwar*, 2015 WL 1396599, at *4.

The *Panwar* court also rejected the plaintiffs' argument that the threat of deportation constituted a threat of serious harm under the TVPA. *Panwar*, 2015 WL 1396599, at *4. One of the *Panwar* plaintiffs alleged that the defendants "threatened to revoke his visa and that he would be deported." *Panwar*, 2015 WL 1396599, at *4. Because the plaintiff's visa program required "that nonimmigrant employees remain employed by the company that sponsored their visas," the court reasoned that visa revocation was not left to the discretion of employers, who are required by law to notify the U.S. Citizenship and Immigration Service if a visa

holder is no longer employed. *Panwar*, 2015 WL 1396599, at *4. If it were to accept the plaintiffs' argument, the court reasoned, any employer would be in violation of the TVPA merely by complying with the requirements of the visa program. *Panwar*, 2015 WL 1396599, at *4. The court therefore found that the threat of visa revocation and deportation under the circumstances was not a threat of serious harm for purposes of the TVPA. *Panwar*, 2015 WL 1396599, at *4.

Here, as in *Panwar*, the Advance Amount clause provides for a specific amount based on actual expenses, as evidenced by the fact that the contractual provision was found enforceable in the Previous Litigation.  Likewise, to the extent Estavilla argues the Offer Letter's statement that "failure to meet any of your obligations under the terms of this letter" would be reported "to the Department of Labor, Immigration and Naturalization Service and/or Immigration and Customs Enforcement Agency under applicable immigration fraud statues" (Doc. 9-1, at 6) constituted a threat of serious harm, the Court is not persuaded. Estavilla has not shown that the mere presence of this clause addressing Village Health's reporting duty under federal law constitutes harm or the threat of serious harm under the TVPA. As pointed out above, Estavilla does not allege in her Complaint that Village Health ever threatened to report her to immigration authorities or that she felt compelled to continue working for Village Health because of this clause. To the contrary, the fact that she counterclaimed for wrongful termination of contract

41

in the Previous Litigation indicates that, if anything, she did not want her employment with Village Health to come to an end.

In sum, even taking the allegations in the Complaint as true and considering them in combination, the Court finds that Estavilla has not alleged sufficient facts to plausibly state a claim for relief based on "serious harm or the threat of serious harm" within the meaning of § 1589(a)(2) of the TVPA.

> b. *Abuse or threatened abuse of law or legal process.*

Estavilla also claims that Defendants knowingly obtained her labor or services by means of "the abuse or threatened abuse of law or legal process" in violation of 18 U.S.C. § 1589(a)(3).

The TVPA defines the term "abuse or threatened abuse of law or legal process" as:

> the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

18 U.S.C. § 1589(a).

Estavilla first argues that Defendants threatened the abuse of law in violation of § 1589(a)(3) by including the liquidated damages provision in the Offer Letter and suing her in Minnesota state court to enforce that provision. As discussed above, however, Defendants prevailed in the Previous Litigation. This case is thus different from *Paguirigan I,* where the court determined that the plaintiffs had

42

sufficiently alleged abuse of legal process because the defendants brought suit against the plaintiff and other nurses to enforce the liquidated damages provision even after it had been declared unenforceable. *Paguirigan I*, 286 F.Supp.3d at 435.

Here, in contrast, the Minnesota state court ruled in Defendants' favor and enforced the liquidated damages provision in the Offer Letter. Estavilla's argument conflates permissible "use" of the legal process with "abuse" of the legal process. See *Panwar*, 2015 WL 1396599, at *5. Under these circumstances, it is difficult to see how Defendants could be said to have used the legal process "in any manner or for any purpose for which the law was not designed," as required to establish "abuse or threatened abuse of law or legal process" within the meaning of § 1589(a)(3).

Estavilla next argues that Defendants violated § 1589(a)(3) by including threatening in the Offer Letter to report her to immigration authorities if she failed to pay restitution. The threat of deportation may constitute threatened abuse of legal process under § 1590(a)(3). See *Nunag-Tanedo v. E. Baton Rough Parish Sch. Bd.*, 790 F.Supp.2d 1134, 1146 (C.D. Cal. 2011). In addition, courts have held that threatening other adverse immigration consequences may be an abuse of legal process within the meaning of the TVPA. See *Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 93 (2d. Cir. 2019); *Mairi Nunag-Tanedo v. e. Baton Rouge Par. Sch. Bd.*, 790 F.Supp.2d 1134, 1146 (C.D. Cal. 2011). But the provision in the Offer Letter

that Estavilla relies on relates to Village Health's reporting duty under federal law, and Estavilla does not allege in her Complaint that Village Health ever threatened to report her to immigration authorities or that she felt compelled to continue working for Village Health because of this clause. As such it does not constitute an abuse of legal process within the meaning of the TVPA.

Finally, Estavilla maintains that Defendants impermissibly threatened abuse of law or legal process by including an illegal non-compete clause in the Offer Letter. Absent some allegation by Estavilla that she felt forced to continue working for Village Health because of the non-compete clause, or that Defendants attempted to enforce the clause against her, the Court finds this allegation is not sufficient establish "abuse or threatened abuse of law or legal process" as defined in § 1589(c)(1).

For the reasons outlined above, the even taking the allegations in the Complaint as true and considering them in combination, the Court finds that Estavilla has not alleged sufficient facts to plausibly show that Defendants used or threatened use of a law or legal process in a manner for which the law was not designed, as required to establish "the abuse or threatened abuse of law or legal process" within the meaning of § 1589(a)(3) of the TVPA.

Because Estavilla has not alleged sufficient facts to plausibly demonstrate that she was subject to forced labor within the meaning of § 1589(a), she fails to state a claim for relief under this section of the TVPA.

2.    Section 1590

Estavilla also brings a claim under 18 U.S.C. § 1590, which prohibits human trafficking to further forced labor. Section 1590 imposes liability on "whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter." 18 U.S.C. § 1590(a).

This claim fails for the same reasons that Estavilla's claim under § 1589(a) fails. Because Estavilla has not sufficiently alleged that she was subjected to forced labor, she has not stated a claim for relief under § 1590.

3.    Section 1594(a),(b)

Estavilla further alleges claims for attempt to violate the TVPA under § 1594(a) and conspiracy to violate the TVPA under § 1594(b). Section 1594(a) extends liability to "whoever attempts to violate section 1581, 1583, 1589, 1590, or 1591" of the TVPA. Section 1594(b) imposes liability on "[w]hoever conspires with another to violate section 1581, 1583, 1589, 1590, or 1592" of the TVPA.

Because Estavilla has not stated a claim for relief under §§ 1589 and 1590, she similarly fails to state a claim for relief under § 1594.

2.    Montana law

In addition to her claims under the TVPA, Estavilla alleges a state law human trafficking claim under Mont. Code Ann. § 27-1-755. (Doc. 5, at 16). This civil remedies provision provides that "[a] victim of human trafficking may bring a civil action against a person who commits an offense against the victim under 45-5-702, 45-5-703, 45-5-704, or 45-5-705 for compensatory damages, punitive damages, injunctive relief, or any other appropriate relief. Mont. Code. Ann. § 27-1-755(1).

Estavilla alleges corresponding violations of Mont. Code Ann. § 27-2-702 and Mont. Code Ann. § 27-2-703. Section 702 provides for liability against anyone who purposely or knowingly:

> (a) recruits, transports, transfers, harbors, receives, provides, obtains, isolates, maintains, or entices another person intending or knowing that the person will be subjected to involuntary servitude…; or
>
> (b) benefits, financially or by receiving anything of value, from facilitating any conduct described in subsection (1)(a) or from participation in a venture that has subject another person to involuntary servitude …

Mont. Code Ann. § 45-5-702. Section 703, in turn, extends liability for involuntary servitude to anyone who "purposely or knowingly uses coercion to compel another person to provide labor or services, unless the conduct is otherwise permissible under federal or state law." Mont. Code. Ann. § 45-5-703.

For purposes of Montana's civil remedies provision, "coercion" is defined, in relevant part, to include the following:

(a) the use or threat of force against, abduction of, serious harm to, or physical restraint of a person;

(b) the use of a plan, pattern, or statement with intent to cause a person to believe that failure to perform an act will result in the use of force against, abduction of, serious harm to, or physical restraint of a person;

(c) the abuse or threatened abuse of law or legal process; …

(f) the use of debt bondage.

Mont. Code. Ann. § 45-5-701(2).

Defendants take the position that Estavilla's statutory claims under Montana law fail for the same reasons that her claims under the TVPA fail, namely, because she has not alleged sufficient facts to demonstrate human trafficking, or that she was subject to involuntary servitude or compelled to provide labor or services in violation of §§ 45-5-702 or 45-5-703. (Doc. 17, at 31).

In response, Estavilla focuses on the involuntary servitude provisions of § 45-5-703, which prohibits a person from using "coercion to compel another person to provide labor or services." Turning to the statutory definition of coercion, Estavilla agrees with Defendants that subsections (a) through (c) overlap with the TVPA's requirements. (Doc. 17, at 31). Thus, to the extent Estavilla's state law claims are premised on allegations of "serious harm," those claims rise and fall with her claims under the TVPA.

While Estavilla agrees that subsections (a) and (c) overlap with the TVPA, she maintains that subsection (f), which prohibits "the use of debt bondage," is

unique and independent of her claims under the TVPA. As relevant to Estavilla's argument, "debt bondage" is defined as "inducing a person to provide: . . . (b) labor or services in payment toward or satisfaction of a real or purported debt if: (i) the reasonable value of the labor or services is not applied toward the liquidation of the debt." Mont. Code. Ann. § 45-5-701(4).

Estavilla contends that she has alleged sufficient facts demonstrating that Defendants engaged in this form of debt bondage. Estavilla claims that she was "forced" to sign a promissory note that required her to pay back $26,642.47 plus interest. Under the terms of the Promissory Note, that debt would be forgiven, but only if remained employed with Village Health through November 5, 2020. Village Health terminated Estavilla's employment on May 24, 2019, however, and sued her for repayment of the full amount. Estavilla thus contends that Defendants did not apply any of her labor or services to the liquidation of the debt, and engaged in coercion through debt bondage by failing to account for any of the 18 months that she was employed by Village Health. (Doc. 17, at 32).

Defendants maintain in reply that, contrary to Estavilla's argument, debt bondage is contemplated under the TVPA and is governed by the "financial harm" standards discussed above. With respect to Estavilla's allegation that they did not apply "the reasonable value of her labor against the debt amount to liquidate the debt," Defendants maintain that the Minnesota court assessed the reasonable value

of Estavilla's labor and services in the in the Previous Litigation. The Court agrees with Defendants that Estavilla's argument is foreclosed by the final judgment entered in the Previous Litigation, which has res judicata effect.

Moreover, like Estavilla's claims under the TVPA, her state law human trafficking claims are compulsory counterclaims that she has waived by failing to bring them in the Previous Litigation because they all stem from the same aggregate set of operative facts involving Estavilla's employment with Village Health and the terms of the Offer Letter and Promissory Note.

### 3. Declaratory Judgment

Estavilla's Complaint also includes a declaratory judgment claim seeking a determination that the contractual venue and choice of law provisions contained in the Offer Letter are unenforceable. (Doc. 5, at 16).

Neither party addresses this claim in their briefs. Presumably, the parties agree that whether Estavilla's declaratory judgment claim survives dismissal depends entirely on whether any of her claims under the TVPA or Montana law also survive.

## IV. Conclusion

For the reasons discussed above,

//

49

IT IS ORDERED that Defendants' Motion to Dismiss the Complaint for Failure to State a Claim for Relief under Rule 12(b)(6) is GRANTED.

DATED this 23rd day of February, 2022.

Kathleen L. DeSoto
United States Magistrate Judge